# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### 3:18-cv-383-MOC
#### (3:13-cr-280-MOC-DSC-1)

| | | |
|---|---|---|
| **STEVE HALE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| ———————————————— | ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct

Sentence under 28 U.S.C. § 2255, (Doc. No. 1).

## I.    BACKGROUND

Petitioner was charged in the underlying criminal case with 31 counts related to a

conspiracy from to transport stolen property. Specifically, he was charged with one count of

conspiracy to transport stolen property in interstate commerce from at least 2006 through March

2011 (18 U.S.C. § 371); 12 counts of transporting stolen property in interstate commerce and

aiding and abetting the same (18 U.S.C. §§ 2314 and 2); three counts of making a false statement

in his income tax returns (26 U.S.C. § 7206(1)); 14 counts of failing to collect, account for, and

pay over federal taxes on an employee's wages (26 U.S.C. § 7202); and one count of obstruction

of justice (18 U.S.C. § 1503). (3:13-cr-280, Doc. No. 16). The facts of the case are as follows:

> At the heart of the charged conduct was the government's allegation that,
> as part of an organized retail theft scheme, Hale served as "a Second-Level Fence
> engaged in the purchase and resale of stolen consumer products, goods and
> merchandise." Specifically, the government alleged that professional shoplifters—
> or "boosters," as they were called—had stolen millions of dollars worth of over-
> the-counter medications and health-and-beauty products from the shelves of retail
> stores and then sold the goods to first-level fences, who in turn sold the goods to

1

Hale, the sole owner and operator of a warehouse in Denver, North Carolina, doing business as Double D Distributing, LLC. Hale profited, according to the government, by selling the stolen goods to at least one third-level fence.

The government's investigation began in the fall of 2010, when detectives with the Gastonia, North Carolina Police Department learned that heroin addicts in the area were routinely shoplifting large quantities of goods—particularly over-the-counter medications and health-and-beauty aids—from local stores and selling them to get money to buy heroin on a day-to-day basis. These boosters often operated in teams of two to four individuals and routinely stole $1,000 to $3,000 worth of merchandise in a matter of minutes. After some of the boosters identified a woman named Bonnie Bridges as their fence, officers set up surveillance that confirmed that numerous boosters were taking their shoplifted merchandise to Bridges' house on a daily basis. Officers then saw Bridges taking the merchandise to Hale's warehouse, which was a plain white metal building with no identifying signs. Officers conducted further surveillance at the warehouse and eventually set up a pole camera across the street.

Between October 2010 and March 2011, their surveillance revealed that Bridges, often accompanied by her sister, regularly delivered stolen merchandise to the Double D warehouse. Bridges' two daughters and their husbands also made routine deliveries to the warehouse, as would a man named Darryl Brock. They all delivered their merchandise in plastic garbage bags, plastic storage bins, and boxes, and one officer who participated in the surveillance testified that he never saw anyone else, including any commercial trucks, make deliveries to the warehouse. On numerous occasions between October 2010 and March 2011, Hale was present at the warehouse when these individuals were paid cash for the stolen merchandise they delivered.

On October 20, 2010, investigating agents intercepted a FedEx shipment from the Double D warehouse to Jeff Telsey at JCA Enterprises in Boca Raton, Florida. In that shipment were items that the officers had marked with an ultraviolet-light pen prior to having a cooperating booster sell the items to Bridges. The shipment also contained merchandise marked with active security sensors and stickers identifying the retail store where the item was intended to be sold and a telephone number for people to call if the item was found elsewhere. This telephone number allowed people to find out if the product was stolen or if it was legitimately in the secondary market.

Investigating agents executed a search warrant at the Double D warehouse on March 24, 2011, where they found numerous shelves containing labeled boxes of merchandise and a "cleaning station" with different products used to remove stickers, sensors, and glue. Sharon Cooke, who worked at the warehouse, was present at the beginning of the search and agreed to make two recorded telephone calls to Hale, who was in Florida at the time. She told Hale that the IRS "was around asking questions." During one of the calls, Hale responded, "Well, you don't know who we're doing business with," and then repeated, "You don't know who the

business is with, do you?," even though Cooke did in fact know the identities of both the business' suppliers and customers.

On the same day that agents searched the Double D warehouse, they also searched Bridges' residence and arrested Bridges. After she was released from jail, she called Hale to accuse him of "throw[ing] us under the bus." Hale responded that he "hadn't done anything"; that Bridges and her family "shouldn't have done him the way that [they] did"; and that "he hoped [they] didn't turn on him." Moreover, the same day that officers searched Hale's warehouse, Hale called Brock, warning him that Bridges had gotten "arrested for a bunch of stolen merchandise"; "that the FBI was at his warehouse"; and that they would "probably be coming after [Brock] next." The next day, Hale advised Brock to "get rid of [his] product" and to take money out of his bank accounts before they were frozen by the police. Consistent with the latter piece of advice, Hale withdrew more than $236,000 from a joint bank account that he shared with his wife, redepositing the money in a new account in her name only.

One week after the search, on April 1, 2011, Hale listed his 26-foot boat for sale with a broker in Florida, asking more than $39,000. At some later point, however, Hale took the boat's title to a close family friend who was an auctioneer and signed the title over to his friend's company. The friend had the boat on his car lot for a few weeks but, at Hale's request, moved it inside a building. Sometime after June 8, 2011, when a court issued a seizure warrant for the boat, Hale told his friend about the warrant and stated, "If anybody asks you any questions, it's your boat." Sometime later, Hale prepared a fraudulent promissory note reflecting that his friend had agreed to pay $18,000 for the boat, which they backdated to May 9, 2011.

United States v. Hale, 857 F.3d 158, 162–64 (4th Cir. 2017).

The Government supported its case with surveillance videos of activity outside Petitioner's warehouse, testimony of investigating officers, and testimony from several of Petitioner's alleged co-conspirators including Bridges, Brock, Cooke, and Telsey. For instance:

Bridges testified that she met Hale in 2000 when she was selling over-the-counter medicines and health-and-beauty aids at a flea market after buying them directly from drug-addicted shoplifters. At that time, Hale approached her table and indicated that he might be interested in buying her products, particularly "Tylenol, Advil, [and] stuff like that." Thereafter, Hale gave Bridges a price list for the merchandise he wanted to buy and said he would pay cash for as much of that merchandise as she could deliver. For example, Hale would pay $4 for a 100-count bottle of Aleve, less than one-half the manufacturer's wholesale price of $8.61, and $6 for a 14-count package of Prilosec, substantially less than the wholesale price of $10.01. Hale told Bridges that he would not accept goods that were damaged or within one year of their expiration date. Based on Hale's price list, Bridges told the

boosters what goods she wanted and how much she would pay for those goods, usually setting her price so that she made at least one dollar on each item. As to the merchandise that Hale would not accept, Bridges sold it at flea markets, where she also continued to sell other miscellaneous items.

For the first five or six years that Bridges and Hale did business together, Hale would send someone to pick up the merchandise at Bridges' house. Eventually, however, Hale gave Bridges the address of his warehouse, and Bridges started delivering the stolen merchandise to the warehouse on an almost daily basis. Starting around 2004 or 2005, her daughters and their husbands found their own boosters to buy from in order to make money by reselling stolen merchandise to Hale.

At times, the drug-addicted shoplifters Bridges bought from would get arrested, and, when Hale or Cooke would ask her why she was not bringing in as much product, she would respond that her "people [were] on vacation." Bridges testified that Hale would not "ask any more questions about that." At no point during the decade that Bridges sold Hale stolen merchandise did Hale ever ask her for proof that the products she was selling to him were not stolen; nor did he ever ask about the retailer stickers, which were on at least 20% of the items that she sold to him.

Brock testified that he first met Hale in 2000, when his father introduced them. At the time, Brock and his father owned a fireworks store, but Brock was also buying over-the-counter medicine and health-and-beauty aids from drug-addicted boosters and selling the stolen merchandise at flea markets. Brock's father had previously sold stolen merchandise, and he told Brock that Hale "was okay and ... was buying ... the health and beauty aid stuff which [Brock] had." Hale subsequently provided Brock with a price sheet and started buying goods from him. In 2002, Brock was arrested after law enforcement officers executed a search warrant on a trailer located behind his fireworks store and recovered counterfeit items and 20 boxes of stolen merchandise. While the charges were pending, Brock asked Hale if "he could help [him] out," and Hale gave Brock a fraudulent "receipt for 20 banana boxes and a bunch of receipts from a Walmart," leading police to drop the stolen property charge.

For several years after his arrest, Brock stopped dealing in stolen merchandise, but he got back into the business after meeting Bridges at a flea market in the spring of 2010. When he approached her booth, he could almost immediately tell, from "being in that business before," that her products were stolen goods. Brock started buying goods from Bridges regularly and eventually started selling some of those goods to Hale.

In late 2010, Hale and Brock had conversations about going into business together, with the idea that Brock would operate a warehouse in South Carolina. During these conversations, Hale told Brock that he made $18,000 in "a bad month" and that he was getting about 90% of his merchandise from Bridges and the members of her family. Hale advised Brock that he should always pay his suppliers

in cash because he would "have to report it if [he] put it on the books," and he also told Brock to "make sure that [he] [got] everybody on tape saying that they don't deal in stolen merchandise," even giving Brock a voice recording pen device to be used for that purpose. He also gave Brock a device that could be used to detect if someone was wearing a wire.

Cooke testified that she first started working for Hale in 2001 when her sister-in-law, who was already working for him, needed help. Cooke and her sister-in-law worked together on a full-time basis until her sister-in-law left in 2006, and, from that point forward, Cooke essentially ran the warehouse's daily operations, although Hale had an office there and was present about one-half the time. Bridges and the other suppliers called Cooke about an hour before they arrived at the warehouse with an estimate of how many items they were bringing, so that Bridges could go to the bank and withdraw cash from Hale's business account. Cooke then received the merchandise as it was delivered and paid the suppliers cash for it, often in the thousands of dollars. Cooke maintained a financial ledger of the transactions—on which Hale also made entries—that identified the suppliers, at first by codenames (such as "FW" for "fireworks," the codename for Brock, and "BG" for "Bonnie Gastonia," the codename for Bridges, who lived in Gastonia, North Carolina) and later by symbols (such as a star for one of Bridges' daughters and an asterisk for the other). After the suppliers left, Cooke—sometimes assisted by one of her family members—unpacked the merchandise, checked it for damage and shelf life, "cleaned" it of any retailer's stickers or sensors, and sorted it. Once the merchandise was cleaned and categorized, Cooke repackaged it and sent Hale a list of the inventory that was ready to ship. After Hale negotiated a deal with one of his purchasers, Cooke put the boxes of cleaned merchandise on pallets for shipping and prepared bills of lading.

Initially, Hale paid Cooke $500 in cash every two weeks for her work, but he eventually increased her pay to $20 in cash for every box of goods that she processed. Cooke withdrew cash from Hale's bank account to pay herself and also to buy all of the warehouse's supplies. While Cooke decided what hours to work, she nonetheless worked full time and exclusively for Hale for approximately a decade. With respect to Cooke's work, Hale reported having paid around $50,000 to "Sharon's Packaging" for each tax year from 2006 through 2008, but he never issued Cooke either a W-2 or a 1099 tax form, nor did he withhold any of her income for taxes.

Jeff Telsey, who had been the owner and operator of JCA Enterprises, testified that he regularly bought stolen goods from Hale in order to resell them to retailers. When a shipment arrived from Hale, his operation inspected each item for damage, expiration dates, and stickers identifying the store where the item was supposed to be sold. He was concerned about such stickers—which he sometimes found on items in Hale's shipments—because any retailer receiving such products "would know that this was obviously stolen property." Telsey never called the phone numbers printed on the stickers because he already "knew [he] was dealing in stolen property." Telsey testified that he liked doing business with Hale because

Hale sent him large quantities of the types of items that were the easiest for him to resell and Hale's prices were generally 10-15% lower than Telsey's other suppliers. When Telsey spoke with any of his suppliers, including Hale, they never used the word "stolen," but Telsey "took it for granted that everybody knew—had to know it was stolen" and that anyone with "half a brain in their head ... would know it was stolen." Hale stopped selling to Telsey at some point in 2010, telling Cooke that Telsey was being investigated for dealing in counterfeit razor blades and indicating that, as a result, they would "probably be investigated for [dealing in] stolen product[s]."

Representatives from Bayer Health Care and Procter & Gamble—companies that manufactured some of the products at issue—testified that there was no legitimate way to buy their company's products for prices as low as the ones Hale charged. Similarly, the manager of CVS's organized retail crime unit testified that there was no lawful way for "loose goods with different expiration dates from different stores with stickers on them" to come into the market.

Hale, 857 F.3d at 164–66.

Petitioner moved for judgment of acquittal on all counts at the close of the Government's case, which was denied. (Id., Doc. No. 50 at 26-27). Petitioner then presented testimony from several witnesses, some of whom testified about the existence of a legitimate secondary market in over-the-counter medicines and beauty aids. Petitioner took the stand to testify in his own defense. Counsel asked that the Court preclude the Government from asking Petitioner about a prosecution that was brought against Petitioner and more than 10 other defendants for conspiring to transport or receive stolen goods (over the counter drugs and health and beauty aids) between 1992 and 1994. In that prosecution, Petitioner's conviction was overturned on the ground that the evidence did not show that defendants had been willfully blind to the fact that they were dealing in stolen property. United States v. Ebert, 178 F.3d 1287 (4th Cir. 1999). See (3:13-cr-280, Doc. No. 51 at 187). The Government agreed not to ask Petitioner about the prior charges and trial but argued that it should be able to cross-examine him about his business dealings with Don Thomas, the first-level fence at the heart of the Ebert case. (Id., Doc. No. 51 at 188). Petitioner's counsel agreed that such a question was "fair game." (Id., Doc. No. 51 at 194). The Court agreed that the Government

should avoid referencing the fact that Petitioner was previously charged, but ruled that "if he gained knowledge at that time and then … used that to be willfully blind in an effort to pull this off, then … that needs to come out." (Id., Doc. No. 51 at 200).

Petitioner testified that he became involved in the secondary market business in 1992, when he bought $20,000 worth of merchandise at flea markets and gradually started identifying buyers. He stated that his business model involved dealing in "depressed product," meaning product that is "not in factory boxes" and does not "look factory new," and that he had "bought [product] from every known source that you can buy from." (Id., Doc. No. 51 at 213-16). He testified that in his ten years of dealing with Bonnie Bridges, he had never heard "one word ... spoken about her being a fence," adding that "nobody can run a booster operation ten years and deal with crackheads" without getting caught, that Bridges was "probably the [most] trusted buyer [he] had," and that he "never ever thought she was selling stolen goods." (Id., Doc. No. 51 at 243-44). Petitioner later added that he checked her criminal background and also verified that she was at flea markets when she said she was going to be. (Id., Doc. No. 51 at 256).

On cross examination Petitioner acknowledged that, before he met Bridges, he had been involved in the secondary market; that one of the people from whom he had bought over-the-counter medicines and health-and-beauty aids was Don Thomas; and that he later learned that Thomas had been getting his goods from boosters and fences. (Id., Doc. No. 52 at 27). He acknowledged that when he got back in the business in 2001, he knew that the presence of stolen property in the market was "a great risk." (Id., Doc. No. 52 at 28). He also admitted that he had previously done business "with independent fences," but denied walking out of the room "whenever boosters would show up at those fences' places." (Id., Doc. No. 52 at 30-31). In an attempt to refresh Petitioner's recollection, the Government asked Petitioner to read silently from

a document that was not identified for the jury but that was a copy of the Fourth Circuit's unpublished opinion in <u>Ebert</u>. (<u>Id.</u>, Doc. No. 52 at 31-32). After reading the passage, Petitioner maintained that somebody had falsely said that he had purposefully left the room when boosters were present. (<u>Id.</u>, Doc. No. 52 at 32).

Petitioner renewed his motion for judgment of acquittal at the close of all the evidence and the Court again denied the motion. (<u>Id.</u>, Doc. No. 52 at 94).

In closing argument, the Government referred to evidence indicating that boosters who stole merchandise and sold it to Bridges were drug addicts and it repeatedly emphasized, without objection, that most of the money that Petitioner paid to Bridges ultimately went to the local drug dealers who were supplying the boosters with heroin and cocaine. <u>See</u> (<u>Id.</u>, Doc. No. 52 at 102 *et seq.*).

Before the Court instructed the jury, Petitioner objected to the Court's decision to provide the jury with a willful blindness instruction. (<u>Id.</u>, Doc. No. 51 at 314-15). Petitioner's counsel agreed, however, that if the Court was going to give such an instruction, that there was no problem with the Court's proposed instruction. <u>See</u> (<u>Id.</u>, Doc. No. 51 at 314-15); (<u>Id.</u>, Doc. No. 52 at 95).

The jury convicted Petitioner on all counts after the seven-day jury trial.

The Presentence Investigation Report ("PSR") calculated the combined total offense level as 34, which included a two-level enhancement for obstruction of justice and a four-level enhancement for Petitioner's role as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. <u>See</u> (3:13-cr-380, Doc. No. 79). Petitioner had zero criminal history points and a criminal history category of I. (<u>Id.</u>, Doc. No. 79 at ¶ 60). This resulted in an advisory guideline range of 151 to 188 months' imprisonment. (<u>Id.</u>, Doc. No. 79 at

¶ 82). Petitioner filed objections to the PSR including objections to the obstruction of justice and role enhancements. (Id., Doc. Nos. 74, 85).

At the sentencing hearing, the Court considered extensive argument by the parties on issues including the role and obstruction enhancements. The Court specifically acknowledged the law that applies to role enhancements including the seven factors that must be considered in determining a leadership or organizational role and entertained extensive argument by the parties. (Id., Doc. No. 108 at 107-08). The Court sustained Petitioner's objection to the obstruction of justice enhancement and removed the two points on that issue. (Id., Doc. No. 108 at 141). The Court overruled Petitioner's objection to the role enhancement but found that "if this aggravating role did not [apply] … the Court would follow the application notes and depart upward … [a]nd in the alternative would vary upward four levels." (Id., Doc. No. 108 at 143). It concluded that the applicable guideline range is 97 to 121 months and sentenced Petitioner at the bottom of that range to 97 months' imprisonment. (Id., Doc. No. 108 at 144-46, 166); see (Id., Doc. Nos. 93, 107, 109) (Judgment and Amended Judgments).

Petitioner's main argument on direct appeal was that the evidence was insufficient to support the Court's decision to provide the willful blindness instruction and otherwise support the jury's finding that Petitioner knew the property was stolen. Petitioner also challenged the form of the willful blindness instruction that the Court gave as well as the instructions that the jury give special scrutiny to Petitioner's testimony, and on conspiracy law. Petitioner challenged the Court's admission of three categories of evidence, *i.e.*, evidence that Bridge's boosters were drug addicted which was irrelevant and more prejudicial than probative, evidence relating to his prior acquittal for conspiracy to deal in stolen goods was not relevant, more prejudicial than probative, and was prohibited bad character evidence, and Brock's testimony that he understood from his father than

Petitioner dealt in stolen goods, which was hearsay and prohibited bad character evidence. Petitioner argued that the Government failed to present sufficient evidence that Cooke was his employee rather than an independent contractor as necessary to support his convictions on 14 counts of failing to collect and pay employee taxes. Finally, Petitioner argued that the prosecutor engaged in misconduct by arguing during closing that Petitioner denigrated the community by feeding individuals' drug addiction and indirectly lining the pockets of drug dealers, which improperly inflamed the jury deprived him of a fair trial.

The Fourth Circuit concluded that there was "ample evidence (both direct and circumstantial) from which to find first that Hale 'subjectively believe[d] that there [was] a high probability' that the goods he was buying and selling were stolen," as well as "ample evidence from which to find that Hale took deliberate actions to avoid confirming that the goods were in fact stolen." Hale, 857 F.3d at 168-69. Therefore, it concluded the Court did not abuse its discretion by providing the jury with a willful blindness instruction. Id. at 169. The Fourth Circuit found that "[i]n addition to the evidence showing willful blindness to satisfy the knowledge element of the offense, the government also presented evidence that Hale *actually* knew the goods in question were stolen." Id. Therefore, whether by evidence of willful blindness or actual knowledge, "the government offered sufficient evidence from which the jury could find beyond a reasonable doubt that Hale knew that the goods in which he was dealing were stolen." Id. With regards to the form of the willful blindness instruction, the Fourth Circuit found that counsel waived any objection to the form of that instruction. However, the Fourth Circuit went on to find that, if it was to consider this new objection to the instruction's form, "we would readily conclude that the district court did not err in giving the form of willful blindness instruction that it gave to the jury." Id. at 170.

The Fourth Circuit rejected Petitioner's arguments about the three categories of evidence that he argued was inadmissible. First, the Fourth Circuit found that the Court did not err in admitting evidence that Bridges' boosters were drug addicts because their addiction motivated them to shoplift thousands of dollars of merchandise for quick sale and was thus at the heart of how the retail theft scheme was able to function. The Fourth Circuit concluded that the Court did not abuse its discretion, let alone commit plain error, by admitting this type of evidence. Second, counsel waived the argument that evidence relating to Petitioner's prior acquittal for conspiracy to deal in stolen goods and moreover, "[n]othing in the government's questions or in its acts of handing Hale a printed copy of the opinion [in Ebert] to refresh his recollection informed the jury that there had previously been a case against Hale involving fences." Hale, 857 F.3d at 172. Third, Brock's testimony about his father's statement was not hearsay because it was not admitted for its truth, but rather, to show why Brock thought he could sell stolen goods to Petitioner and therefore the Court was not required, *sua sponte*, to exclude this brief explanation by Brock of his own state of mind. Id.

Petitioner's challenges to the two other jury instructions were not plainly erroneous. The instruction about giving special scrutiny to Petitioner's trial testimony "did no more than equate Hale with any other interested witness" and did not imply that Petitioner was inherently unbelievable. Id. at 172. The instruction about conspiracy accurately instructed the jury on the applicable law. Id. at 173.

The Fourth Circuit next turned to the sufficiency of the evidence of Cooke's status as Petitioner's employee as opposed to an independent contractor for the tax counts. While the jury might have been able to find from the evidence that Cooke was an independent contractor, "Hale overlooks the ample evidence supporting the jury's finding that [Cooke] was an employee for

purposes of the tax reporting requirements." <u>Id.</u> Specifically, the evidence showed that Cooke "worked *exclusively* and *full time* at Hale's warehouse for approximately a decade using equipment that Hale supplied and following Hale's directions to complete tasks that were essential to the operation of his business." <u>Id.</u>

Finally, with regards to prosecutorial misconduct, the Fourth Circuit noted that Petitioner did not object at trial. The Fourth Circuit "readily conclud[ed]" that the Court did not plainly err by failing to *sua sponte* issue a curative instruction or declare a mistrial upon hearing the Government's closing argument. It found that "[t]he prosecutor's statements that Hale reaped profits by engaging in conduct that had the effect of fueling illicit drug trafficking was an accurate summary of the evidence, not prosecutorial misconduct. And, in any event, in light of the strength of the government's case, the remarks certainly did not so prejudice Hale's substantial rights that he was denied a fair trial." <u>Id.</u> at 173-74.

Petitioner filed the instant § 2255 Motion to Vacate arguing that counsel was ineffective for failing to adequately investigate and prepare for trial and present an adequate defense, failing to challenge the jury instructions, and failing to object to inadmissible evidence and improper closing argument; and that he was improperly enhanced four offense levels for leadership role. (Doc. No. 1).

The Government filed a Corrected Response, (Doc. No. 8), arguing that Petitioner's claims of ineffective assistance of counsel should be dismissed because Petitioner cannot show deficient performance or prejudice and that the Fourth Circuit previously rejected the basis for several of those claims, and that the claim of sentencing error is not cognizable on § 2255 review and is meritless.

In his Replies, (Doc. Nos. 6, 9), arguing that his ineffective assistance claims were never raised on direct appeal and that trial counsel's failure to object subjected his appellate claims to a higher standard of review, that counsel's errors prejudiced him, and that the role enhancement argument is meritorious. Petitioner also objects to the Government's Corrected Response and argues that it should be dismissed. (Doc. No. 9).

## II.     SECTION 2255 STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. Const. Amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." Id. at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689). The Strickland standard is difficult to satisfy in that the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." See Yarborough v. Gentry, 540 U.S. 1, 8 (2003). The prejudice prong inquires into whether counsel's deficiency affected the judgment. See Strickland, 466 U.S. at 691.

A petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In considering the prejudice prong of the analysis, a court cannot grant relief solely because the outcome would have been different absent counsel's deficient performance, but rather, it "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), *vacated on other grounds*, 218 F.3d 310 (4th Cir. 2000).

To support an ineffective assistance claim based on the failure to investigate, a petitioner must present specific information to show what favorable evidence the investigation would have produced. See Beaver v. Thompson, 93 F.3d 1186, 1195 (4th Cir. 1996). If there is "no reasonable probability that a possible defense would have succeeded at trial," counsel's failure to investigate such a defense is not prejudicial. See Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996). Attorneys have wide latitude in determining which witnesses to call as part of their trial strategy. See generally Pruett v. Thompson, 996 F.2d 1560, 1571 n.9 (4th Cir. 1993) (decisions about what types of evidence to introduce "are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what sort of mitigating evidence they can choose not to introduce."). The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

Where an ineffective assistance claim is based on counsel's failure to file a motion to suppress, the prejudice prong has two distinct components. The petitioner must show both (1) that the motion was meritorious and likely would have been granted, and (2) a reasonable probability that granting the motion would have affected the outcome of his trial. Kimmelman v. Morrison, 477 U.S. 365, 375 (1986); United States v. Jones, 600 Fed. Appx. 74 (4th Cir. 2014) (§ 2255 case applying Kimmelman).

It is well settled that a criminal defendant cannot "recast, under the guise of collateral attack, questions fully considered by this court [on direct appeal]." Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976); United States v. Dyess, 730 F.3d 354, 360 (4th Cir. 2013) (quoting United States v. Linder, 552 F.3d 391, 396 (4th Cir. 2009) (a defendant cannot "circumvent a proper ruling ... on direct appeal by re-raising the same challenge in a § 2255 motion."); see United States v. Roane, 378 F.3d 382, 396 n. 7 (4th Cir. 2004) (noting that, absent "any change in the law," defendants "cannot relitigate" previously decided issues in a § 2255 motion).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.    DISCUSSION

### (1)    Ineffective Assistance of Counsel

Petitioner argues that trial counsel was ineffective for failing to: (a) adequately investigate the case; (b) file a motion to suppress; (c) move to bifurcate the trial; (d) make various evidentiary objections; (e) present an effective defense; (f) object to jury instructions; (g) object to the Government's closing argument.

**(a)**      First, Petitioner argues that counsel conducted inadequate investigation and preparation for the case by: failing to make written discovery requests pursuant to Rule 16 of the Federal Rules of Criminal Procedure; instructing Petitioner not to file amended tax returns; failing to call a forensic accountant to testify about the veracity of tax returns and that he advised Petitioner not to file amended returns consistent with counsel's advice; failing to subpoena American Express and PayPal records to show Petitioner's purchases were legitimate; failing to prepare Petitioner to testify with the "foundation" from the <u>Ebert</u> decision; failing to subpoena INMAR, whose primary business is OTC and HBA, and other store managers regarding the use of reclamation centers about secondary transactions; failing to request surveillance tapes of Petitioner's warehouse; failing to request discovery about Brock's criminal case that could have been used to impeach him; failing to get boat sales expert to defend against the Government's evidence of obstruction of justice; and failing to investigate Cooke's status as an independent contractor.

Petitioner's contention that counsel failed to make discovery requests under Rule 16 fails because the Court's standard criminal discovery order used in this case made discovery requests unnecessary. <u>See</u> Standard Discovery Order docketed October 24, 2013.

Petitioner has failed to establish ineffective assistance of counsel by advising him to file a corrected tax return because counsel's advice – that doing so would admit that the original returns were erroneous – was within the realm of a reasonable strategic decision. <u>See</u> <u>generally</u> <u>Burger v.</u>

Kemp, 483 U.S. 776 (1987) (concluding that failure to introduce character evidence was effective performance because witnesses could have been subjected to harmful cross-examination or invited other damaging evidence); United States v. Dehlinger, 740 F.3d 315 (4th Cir. 2014) (no adverse effect results from a trial lawyer's decision not to call witnesses whose testimony would be cumulative or potentially damaging to a defendant's case). Petitioner has failed to satisfy Strickland's prejudice prong by showing a reasonable probability that he would not have been found guilty of the tax charges had he filed a corrected return after the criminal prosecution was initiated. Petitioner's contention that counsel should have called a forensic accountant about that advice likewise fails and Petitioner's contention that an accountant should have testified about the veracity of tax returns is too vague and conclusory to demonstrate deficient performance or prejudice. See generally United States v. Dyess, 730 F.3d 354 (4th Cir. 2013) (vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the district court).

With regards to the American Express and PayPal records, Petitioner's assertion about what these records might have shown is purely speculative and, even if the records showed that petitioner obtained some merchandise online, it does not negate the strong evidence that Petitioner dealt in stolen merchandise such as Brock's admissions about selling stolen merchandise to Petitioner. Dyess, 730 F.3d at 354.

Counsel was not deficient for failing to subpoena to INMAR and other businesses because other businesses' use reclamation centers had no bearing on whether Petitioner was buying and selling stolen goods and there is no reasonable probability that such information would have been relevant or would have resulted in a different trial outcome. As the Fourth Circuit noted, the Government presented evidence that Petitioner subjectively believed it was highly probable the

goods he was buying and selling were stolen, and that Petitioner actually knew the goods were stolen. Likewise, Petitioner fails to explain how surveillance tapes of Petitioner's warehouse, that ostensibly show that other businesses lacked signage, had a reasonable probability of resulting in a different trial outcome.

Petitioner's arguments that counsel should have requested discovery about Brock's criminal case that could have been used to impeach him, and that counsel should have obtained an expert on boat sales to defend against the Government's evidence of obstruction of justice, are conclusory and speculative because Petitioner has failed to describe what evidence counsel could have obtained in Brock's case that had a reasonable probability of a different trial outcome.

Petitioner's argument that counsel failed to prepare Petitioner to testify with the "foundation" from the Ebert decision is meritless because Petitioner's testimony was supposed to be the truth based on Petitioner's personal knowledge, and not coaching by counsel. Nor has Petitioner adequately demonstrated that there is a reasonable probability of a different trial outcome had counsel spent more time preparing him for trial in light of the bountiful evidence of his guilt.

Finally, Petitioner's claim that counsel should have interviewed Cooke's employees or otherwise investigated Cooke's status as an independent contractor is too vague and conclusory to support relief because Petitioner does not explain what evidence counsel's investigation would have revealed that had a reasonable probability of resulting in a different outcome, especially in light of the evidence that the Fourth Circuit substantial that Cooke was Petitioner's employee.

**(b)**      Petitioner argues that counsel was ineffective for failing to file a motion to suppress addressing the warrantless search and seizure of a Federal Express package sent from Double D to Telsey.

This claim fails because Petitioner has established neither the existence of a meritorious Fourth Amendment claim nor a reasonable probability that suppression would have affected the trial's outcome. Assuming *arguendo* that Petitioner has standing to raise a Fourth Amendment claim with regards to the Federal Express package that was sent from Double D to Telsey, he fails to show a meritorious suppression claim. He alleges that counsel should have challenged the warrantless search of the package. However, the package's intended recipient, Telsey, was cooperating with law enforcement and alerted Agent Chad Rumney that a shipment was on its way from Double D on October 20, 2010 which Rumney intercepted. Telsey's consent to the search of the package rendered a warrant unnecessary. See generally Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."); see, e.g., United States v. Moss, 936 F.3d 52, 61 (1st Cir. 2019) (warrantless search of a U.S. Postal Service package, over which the addressee had actual and apparent authority, was justified by the addressee's consent). Moreover, even if Petitioner had successfully suppressed the October 20, 2010 Federal Express package, he has failed to show a reasonable probability of a different trial outcome. The source of the goods in the October 20 package, Bonnie Bridges, and the goods' intended recipient, Telsey, testified that they supplied stolen goods to Petitioner and purchased stolen goods from him, respectively. Testimony from Bridges and Telsey, among copious evidence from other sources, provided strong evidence of Petitioner's guilt. There is no reasonable probability that the trial outcome would have been different had counsel moved to suppress the October 20 Federal Express package.

**(c)** Petitioner argues that counsel was ineffective for failing to move to bifurcate the trial because the tax case and stolen goods case are two distinct cases and Petitioner was prejudiced by having all the counts combined.

Under Federal Rule of Criminal Procedure 8(a), a single indictment may charge a defendant with multiple counts if the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." See United States v. Branch, 537 F.3d 328, 341 (4th Cir. 2008). Joinder of related charges is broadly permitted to avoid needless duplication of judicial proceedings, United States v. Mir, 525 F.3d 351, 356–57 (4th Cir. 2008), particularly where evidence of one charge would be admissible to prove another charge, see United States v. Peoples, 748 F.2d 934, 936 (4th Cir. 1984). Nonetheless, Rule 14(a) provides that "[i]f the joinder of offenses ... appears to prejudice a defendant or the government, the court may order separate trials of counts." Fed. R. Crim. P. 14(a). The party seeking severance bears the burden of demonstrating "a strong showing of prejudice." United States v. Goldman, 750 F.2d 1221, 1225 (4th Cir. 1984).

In the instant case, all of the charges against Petitioner stemmed from his scheme for buying and reselling stolen OTC and HBA. A great deal of the evidence, especially with regards to Petitioner's relationship with Cooke in the scheme's operation, was directly relevant to Petitioner's tax violations as well as his purchase and resale of stolen goods. Joinder of these charges was proper because they were all based on the same acts or connected transactions, and Petitioner has failed to make a strong showing of prejudice that would warrant severing the tax charges from the remaining charges. See, e.g., United States v. Clark, 928 F.2d 639 (4th Cir. 1991) (denying defendant's claim that the court erred by failing to sever two tax charges from 14 drug-related charges where the tax counts charged defendant with willfully signing income tax returns that

knowingly omitted income from drug transactions and, even if severance had been granted, evidence about the drug transactions would have been admissible in the tax case to prove income and show its probable source). Counsel cannot be deemed ineffective for failing to raise a motion to sever where it would have likely been denied and, even if the counts were bifurcated, there is no reasonable probability that a different outcome would have resulted.

(d)     Petitioner contends that counsel was ineffective for failing to make evidentiary objections to: testimony about the <u>Ebert</u> case in which Petitioner was charged with dealing in stolen goods that was irrelevant, more prejudicial than probative, and went to bad character and propensity; testimony that boosters who supplied stolen goods to Bridges were drug addicted, which was irrelevant and more prejudicial than probative; testimony from witnesses employed by Bayer Health Care, Procter & Gamble, and a CVS who provided expert testimony and negative evidence of which they lacked personal knowledge, they were not qualified as experts, and for which there was no foundation; gave expert testimony although they were not offered or qualified as experts; testimony by Brock that his father told him that Petitioner is "ok" and "was buying HBA," that Brock took to mean that Petitioner deals in stolen goods violates the Confrontation Clause and is inadmissible hearsay.

Petitioner's claims that evidence was improperly admitted about the <u>Ebert</u> case, boosters' drug use, and Brock's testimony that he understood from his father than Petitioner dealt in stolen goods, were raised and rejected on direct appeal by the Fourth Circuit. Petitioner argued on direct appeal that the evidence relating to his prior acquittal in the <u>Ebert</u> case for conspiracy in dealing in stolen goods was "not relevant, was more prejudicial than probative[,] and was prohibited bad character evidence" and the "entire line of questioning served on to inform the jury, impermissibly, that Hale had a prior case involving fences" and was therefore "propensity evidence" that should

have been excluded under Rule 404(b). <u>Hale</u>, 857 F.3d at 171-72). The Fourth Circuit found that this claim was waived and, moreover "[n]othing in the government's questions or in its act of handing Hale a printed copy of the opinion to refresh his recollection informed the jury that there had previously been a case against Hale involving fences." <u>Id.</u> at 172. With regards to the boosters' drug use, Petitioner argued on direct appeal that "evidence that Bridges' boosters were drug addicted was not relevant" and that the evidence was more prejudicial than probative, and was an appeal to the jurors' emotions. The Fourth Circuit concluded that "the district court did not err in admitting this evidence" and that its admission was not an abuse of discretion, let alone plain error. <u>Hale</u>, 857 F.3d at 171. Petitioner argued on direct appeal that Brock's testimony that he understood from his father that Petitioner dealt in stolen goods was hearsay and prohibited bad character evidence.[1] The Fourth Circuit rejected those claims, finding that "[t]he out-of-court statement by Brock's father that Hale was "okay" was … properly admitted not for the truth of the matter asserted but to show why Brock thought he could sell stolen goods to Hale." <u>Hale</u>, 857 at 172.

Petitioner has failed to show any change in law that would warrant relitigating these previously decided issues under the guise of a § 2255 collateral attack. <u>See</u> Boeckenhaupt, 537 F.2d at 1183; <u>Linder</u>, 552 F.3d at 396 (a defendant cannot "circumvent a proper ruling ... on direct appeal by re-raising the same challenge in a § 2255 motion."); <u>Roane</u>, 378 F.3d at 396 n. 7 (noting that, absent "any change in the law," defendants "cannot relitigate" previously decided issues in a § 2255 motion). To the extent that he contends that these claims would have succeeded had they been objected-to and thus subject to a different standard of review, he has provided no support for such claims. <u>See</u> <u>generally</u> <u>Dyess</u>, 730 F.3d at 354. Therefore, Petitioner's attempt to recast these claims as ones of ineffective assistance of counsel is rejected.

---

[1] Petitioner's claim that Brock's testimony violated the Confrontation Clause will be discussed separately.

Petitioner's remaining claims are meritless and therefore counsel was not ineffective for failing to raise them. See Knowles, 556 U.S. at 123. First, Petitioner complains that employees of Bayer Health Care, Procter & Gamble, and CVS testified that there was no legitimate market for second-hand OTC and HBA and that Petitioner's low prices had to mean the goods were stolen. He argues that this is "negative evidence" that lacks probative value absent a foundation to showing these witnesses would have known of the absence of a legitimate secondary market for OTC and HBA. He further argues that these witnesses provided expert testimony without having been qualified as experts. Petitioner claims that requiring these witnesses to qualify as experts may have prevented them from giving some of their testimony.

Federal Rule of Evidence 701 provides for the admission of lay opinion testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge [for which an expert would be required]." The line between lay opinion testimony and expert testimony "is a fine one," because "Rule 701 does not distinguish between expert and lay witnesses, but rather between expert and lay *testimony*." United States v. Perkins, 470 F.3d 150, 155 (4th Cir. 2006). Unlike the prerequisites for an expert witness under Rule 702, a lay witness is not required to "possess some specialized knowledge or skill or education that is not in possession of the jurors." Id.

The Government presented testimony by market manager for the Mid-Atlantic region of Bayer Health Care Shanna Simpson, brand protection manager for Procter & Gamble for North America and Latin America Deejay Smith, and manager of organized retail crime unit for CVS Pharmacy Anthony Sheppard. Simpson testified that she manages all grocery accounts for Bayer and negotiates sales with retail merchants. She testified that the prices at which Double D

Distributors sold its products including Aleve to Telsey at JCA was well below Bayer's maximum discounted wholesale price and did not reflect legitimate pricing. (3:13-cr-280, Doc. No. 47 at 199-207). Smith, who has worked for Procter & Gamble in sales and marketing for 20 years and has been the brand protection manager since 2007 testified that the prices at which Double D Distributors sold its products including Prilosec, Fixodent, and Olay products to Telsey at JCA was below its maximum discounted wholesale prices. (Id., Doc. No. 48 at 104-41). Sheppard manages a unit of investigators targeting professional shoplifters for CVS as well as the fences who purchase stolen product. (Id., Doc. No. 49 at 6). Sheppard explained the purpose and use of security stickers on high risk, high value items such as Prilosec, testified about the wholesale and retail prices for high risk, high value items such as Prilosec, and described his knowledge of diverters such as Quality King from which CVS occasionally purchases product. (Id., Doc. No. 49 at 32). All three of these witnesses testified, based on their personal work experience and examination of the evidence in the criminal case, that the prices and circumstances of the products sold by Double D Distributors to Telsey did not reflect the legitimate sale of product, but rather, likely involved stolen goods.

These witnesses' lay opinion testimony was admissible under Rule 701 because it was rationally based on the witnesses' perception, helpful to clearly understanding their testimony or to determining a fact in issue, and was not based on scientific, technical, or other specialized knowledge for which an expert would be required. See Fed. R. Ev. 701; see, e.g., United States v. Baraloto, 535 Fed. Appx. 263, 270–71 (4th Cir. 2013) (rejecting argument that lay testimony that resold goods were stolen because, "[w]hen persons known to be drug addicts repeatedly entered the business with thousands of dollars worth of OTCs and HBAs, and proceeded to sell such items for pennies on the dollar, any reasonable observer could conclude, as a matter of common sense,

that the goods were stolen.").[2] Moreover, there is no reasonable probability that Petitioner's trial would have had a different outcome absent these witnesses' lay testimony that the goods were stolen because there was bountiful evidence of that fact from other sources. Therefore, this claim will be denied.

Second, Petitioner's argument that Brock's testimony about his father's statements did not violate the Confrontation Clause. The Sixth Amendment's Confrontation Clause gives the accused, "[i]n all criminal prosecutions, … the right … to be confronted with the witnesses against him." Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine. Crawford v. Washington, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369, 158 L. Ed. 2d 177 (2004) (footnote omitted). But the admission of non-hearsay does not implicate a defendant's confrontation rights. Id. at 60, n.9 ("The Clause … does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); Fed. R. Ev. 801(c) (an out-of-court statement as hearsay if it is "offered in evidence to prove the truth of the matter asserted."). The Supreme Court has not precisely defined "testimonial," however, it has provided concrete examples of testimonial evidence. United States v. Mathis, 932 F.3d 242, 255 (4th Cir. 2019). At a minimum, testimonial evidence includes "testimony given at a preliminary hearing, before a grand jury, and at a formal trial, as well as statements made during a police interrogation." Mathis, 932 F.3d at 255; Crawford, 541 U.S. at 68, 124 S.Ct. at 1354. Further, a statement is testimonial in nature if the statement was made or procured with the "primary purpose" of creating an "out-of-court substitute for trial testimony." Ohio v. Clark, __ U.S. __, 135 S.Ct. 2173, 2180, 192 L.Ed.2d

<hr />

[2] Baraloto distinguishes Ebert in its analysis of the sufficiency of the evidence because Ebert was based on the theory of willful blindness and the Fourth Circuit determined that the willful blindness instruction was improper in Ebert.

306 (2015) (quoting <u>Michigan v. Bryant</u>, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011)).

Petitioner contends that Brock's testimony about statements that his deceased father[3] made was barred by the Confrontation Clause because Brock's father did not testify at trial. Brock testified that he was in the business of selling stolen and counterfeit goods at flea markets and online in 2000 and 2001. Brock's father approached Brock and said that Petitioner is "okay" and that he was "buying HBA." (3:13-cr-280, Doc. No. 48 at 260). Brock took this to mean that Brock could sell stolen merchandise to Petitioner. (<u>Id.</u>, Doc. No. 48 at 260). After this introduction, Petitioner gave Brock and typewritten list of items that Petitioner was interested in purchasing, the price he would pay for the merchandise, and pickup scheduling. (<u>Id.</u>, Doc. No. 48 at 260-61). Brock testified that he got arrested in 2001 or 2002. (<u>Id.</u>, Doc. No. 48 at 259).

This claim is meritless because Brock's father's statements were not testimonial. Statements between Brock and his father were part of a private conversation that occurred before any legal proceedings were initiated and were not made for the primary purpose of creating an out-of-court statement to substitute for testimony. Further, the statements were not introduced for their truth, but rather, to establish the circumstances under which Brock and Petitioner met and began conducting business. <u>See</u>, <u>e.g.</u>, <u>United States v. Brown</u>, 576 Fed. Appx. 145, 149 (4th Cir. 2014) (confidential informant's statements to detective were not testimonial because they explained the context and motivation for the detective's actions regarding a search warrant). There was no basis for a Confrontation Clause objection under these circumstances.

Moreover, assuming *arguendo* that counsel was deficient for failing to make the foregoing objections, there is no reasonable probability that counsel's objection would have had a different

---

[3] Brock testified that his father passed away in 2001. (3:13-cr-280, Doc. No. 48 at 803).

outcome in light of the strong evidence of his guilt. Therefore, Petitioner's claims that counsel was ineffective for failing to make evidentiary objections will be denied.

(e)     Petitioner contends that counsel failed to present an effective defense by: failing to introduce photographs of Petitioner's warehouse at trial to show that other businesses did not have signage or publicize their businesses, which created the impression that the Double D operation was "dubious." (Doc. No. 1 at 23); failing to introduce bank records showing Petitioner complied with cash reporting requirements which allowed the Government to create the impression that the cash dealings were intended to obfuscate the true nature of Petitioner's business; introducing the recording between Petitioner and Bridges during Petitioner's testimony rather than Bridges' testimony in order to show that her trial testimony contradicted her "spoken words to Movant." (Doc. No. 1 at 25); failing to introduce into evidence or use audio recording between Petitioner and Brock saying that Brock would never sell Petitioner stolen goods; failing to adequately argue that there is a legitimate secondary market in OTC and HBA; failing to present evidence that Cooke was an independent contractor and that Petitioner's and Cooke's activities were not suspicious; and failing to call real estate and insurance agents to testify about their employment as independent contractors so the jury could compare their employment situations to Cooke's.

Petitioner's arguments about signage, bank records, a boat sales expert recording between Petitioner and Bridges are too vague and conclusory to support relief. Petitioner does not show that counsel's decisions about what evidence to submit and when to submit it fell below the wide range of reasonable professional assistance, nor does he demonstrate that these strategic matters had a reasonable probability of a different trial outcome.

Petitioner's contention that counsel failed to adequately argue that there is a legitimate secondary market in OTC and HBA is refuted by the record. Petitioner presented testimony of the

existence of a legitimate secondary market for OTC and HBA. Petitioner fails to show how additional or different evidence about a legitimate secondary market would have changed the trial outcome in light of the evidence that Petitioner knew that the merchandise he purchased and resold was stolen.

Petitioner's contention that counsel failed to present evidence that Cooke was an independent contractor is speculative and refuted by the record. The Fourth Circuit found that there was evidence that Cooke was an independent contractor, but that there was also substantial evidence that Cooke was an employee upon which the jury could have relied. Petitioner has failed to demonstrate that evidence about other professionals such as realtors are independent contractors would have been relevant and admissible at trial. Nor has Petitioner explained how any additional evidence would have negated the substantial evidence of an employee relationship with Cooke such that it would have resulted in a different trial outcome. Petitioner has failed to demonstrate any deficiency by counsel or prejudice under these circumstances. See, e.g., Higgs v. United States, 711 F.Supp.2d 479 (D. Md. 2010) (Fourth Circuit's ruling in the context of a Brady[4] violation that the absence of a witness from trial and failure to provide notes pertaining to that witness had no prejudicial effect on the outcome of the case and that there was strong evidence to support the conviction and sentence even if the statement at issue had been introduced into evidence, barred petitioner from arguing on § 2255 motion that counsel was ineffective for failing to call that witness at trial).

The record reveals that counsel pursued a trial strategy that was within the bounds of reasonable representation and Petitioner has failed to demonstrate that any additional evidence or

---

[4] Brady v. Maryland, 373 U.S. 83 (1963).

different presentation of evidence had a reasonable probability in resulting in a more favorable outcome. Therefore, these claims will be denied.

**(f)**      Petitioner argues that counsel was ineffective for failing to object to a jury instruction on willful blindness that was not supported by the evidence and an instruction on interested witnesses that implied that Petitioner was not credible.

The Fourth Circuit concluded on direct appeal that the Court did not err by providing the jury with a willful blindness instruction because the record included evidence that Petitioner subjectively believed that the merchandise he was buying and selling was stolen and that he took deliberate actions to avoid confirming that the goods were stolen. Hale, 857 F.3d at 169. Although the Court found that Petitioner waived any objection to the form of the willful blindness instruction, it found in the alternative that the claim of error with regards to that instruction was meritless. Hale, 857 at 170-71. Petitioner's argument that the instruction on interested witnesses implied that Petitioner's testimony was false was also raised and rejected on direct appeal. The Fourth Circuit concluded that the Court did not imply that Petitioner's testimony was inherently unbelieveable, but rather, that defendants who testify on their own behalf like Petitioner are interested witnesses whose testimony should be scrutinized like any other interested witnesses. Hale, 857 F.3d at 172-73.

Petitioner cannot demonstrate, in light of the Fourth Circuit's finding that the jury instructions were not erroneous, that counsel was deficient for failing to object or that the instructions prejudiced him in any way. See, e.g., Stitt v. United States, 369 F.Supp.2d 679 (E.D. Va. 2005) (Fourth Circuit's finding on direct appeal that the court was not constitutionally required to give jury instruction barred petitioner from arguing on § 2255 review that counsel was ineffective for failing to request that instruction). Therefore, these claims will be denied.

**(g)**     Petitioner argues that counsel was ineffective for failing to object to the Government's improper closing arguments that boosters used the money they received from Petitioner's business to buy drugs that compared the receipt of stolen goods with drug trafficking and was inflammatory.

On direct appeal, the Fourth Circuit rejected Petitioner's argument that the Government's closing argument that focused on how Petitioner denigrated the community by feeding individuals' drug addiction and indirectly lined the pockets of area drug dealers was inflammatory and improper. Hale, 857 F.3d at 173-74. Counsel cannot be deemed deficient for failing to object to this unobjectionable argument and he cannot demonstrate that this argument prejudiced him.

**(2)**     **Trial Error**

Petitioner also appears to argue that: (a) there was insufficient evidence that Cooke was an employee rather than an independent contractor or that Petitioner subjectively believed there was a high probability that OTC and HBA were stolen or likely stolen;[5] and (b) the role enhancement is not supported by the seven applicable factors.

**(a)**     Petitioner's claims of insufficient evidence were previously decided on direct appeal. Petitioner argued on direct appeal that the Government failed to present sufficient evidence to allow the jury to find beyond a reasonable doubt that Cooke was his employee rather than an independent contractor, as required to support the 14 counts of failing to collect and pay employee taxes. The Fourth Circuit found that there was "ample evidence supporting the jury's finding that [Cooke] was an employee for purposes of the tax reporting requirements … [and that] Cooke worked *exclusively* and *full time* at Hale's warehouse for approximately a decade using equipment

---

[5] It is not entirely clear whether Petitioner is attempting to raise a separate substantive claim of insufficient evidence. It is construed as such in an abundance of caution. See generally Haines v. Kerner, 404 U.S. 519 (1972) (a *pro se* complaint, however inartfully pled, must be held to less stringent standards than formal pleadings drafted by lawyers).

that Hale supplied and following Hale's directions to complete tasks that were essential to the operation of his business." Hale, 857 F.3d at 173. The Fourth Circuit thus had "no difficulty concluding that the jury's finding that Cooke qualified as an employee of Hale's business was supported by substantial evidence." Hale, 857 F.3d at 173.

Petitioner also argued on direct appeal that there was insufficient evidence that Petitioner subjectively believed there was a high probability that OTC and HBA were stolen or likely stolen. The Fourth Circuit found that there was "ample" direct and circumstantial evidence from which to believe that Petitioner subjectively believed that there was a high probability that the goods he was buying and selling were stolen. Hale, 857 F.3d at 168. The Fourth Circuit further found that the Government also presented evidence that Petitioner "*actually* knew that the goods in question were stolen." Id. at 169.

To the extent that Petitioner attempts to assert these claims of insufficient evidence, they are barred because they were previously denied on direct appeal and Petitioner has failed to demonstrate that any change in the law warrants their reconsideration.

**(b)** Petitioner argues that the Court erred in applying a four-level role enhancement for his leadership or organizational role.

Barring "extraordinary circumstances, ... an error in the application of the Sentencing Guidelines cannot be raised in a § 2255 proceeding." United States v. Pregent, 190 F.3d 279, 283-84 (4th Cir. 1999). Section 2255 provides relief for cases in which "the sentence was in excess of the maximum authorized by law." Thus, while § 2255 applies to violations of statutes establishing maximum sentences, it does not usually apply to errors in the application of the Sentencing Guidelines. See United States v. Mikalajunas, 186 F.3d 490, 495-96 (4th Cir. 1999) ("misapplication of the [sentencing] guidelines typically does not constitute a miscarriage of

justice."). Merely alleging a miscalculation of the guidelines does not give rise to a constitutional issue and therefore is not cognizable in the context of a § 2255 motion to vacate. <u>Pregent</u>, 190 F.3d at 284.

This claim is not cognizable on § 2255 review because Petitioner's sentence does not exceed the statutory maximum and this is merely a guidelines calculation error. Moreover, the claimed error is conclusively refuted by the record. The Court stated on the record that it would have imposed the same sentence even if the leadership enhancement did not apply. (3:13-cr-280, Doc. No. 143, 237). Therefore, even if the role enhancement was inapplicable, it had no effect on Petitioner's sentence.

## IV.   CONCLUSION

For the foregoing reasons, the Court denies Petitioner's § 2255 Motion to Vacate.

**IT IS, THEREFORE, ORDERED** that:

1.     Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1), is **DENIED**.

2.     **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability.  <u>See</u> 28 U.S.C. § 2253(c)(2); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: January 22, 2020

Max O. Cogburn Jr.
United States District Judge